EMIL MESINGER and MAXINE MESINGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mesinger v. Commissioner
Docket No. 3670-71.
United States Tax Court
T.C. Memo 1972-229; 1972 Tax Ct. Memo LEXIS 28; 31 T.C.M. (CCH) 1127; T.C.M. (RIA) 72229; November 15, 1972, Filed Walter P. Zivley and Fred E. Croshaw, for the petitioners. James N. Mullen, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: This proceeding involves the income tax deficiencies of petitioners for 1967, 1968, and 1969. For 1967, petitioners filed separate returns, and in separate notices of deficiency respondent determined the following deficiencies and additions to tax under section 6653(a): [1]
Petitioner
Tax Deficiency
Addition to Tax
Emil Mesinger
$ 297.11
$14.86
Maxine Mesinger
1,204.56
60.22
*29 In his Answer to First Amended Petition, respondent alleged the following deficiencies and additions to tax under section 6653(a) for 1967 in lieu of the amounts shown in the notices of deficiency: Petitioner
Tax Deficiency
Addition to Tax
Emil Mesinger
$ 433.60
$21.68
Maxine Mesinger
1,380.05
69.00
For 1968 and 1969, petitioners filed joint returns and respondent determined the following deficiencies and additions to tax under section 6653(a): Year
Tax Deficiency
Addition to Tax
1968
$1,698.15
$84.91
1969
1,870.49
93.52 In his Answer to First Amended Petition, respondent alleged the following deficiencies and additions to tax under section 6653(a) in lieu of the amounts shown in the notice of deficiency: Year
Tax Deficiency
Addition to Tax
1968
$2,607.59
$130.37
1969
2,878.63
143.93
The issues for decision are as follows: (1) Whether the fair rental value of an apartment furnished to petitioners without cost is properly includable in their gross income for 1967, 1968, and 1969; and, if so, (2) What percentage, if any, of the fair rental value of the apartment are petitioners entitled to *30 deduct as a business expense under section 162(a) for each of the years in issue? FINDINGS OF FACT Petitioners, husband and wife, were legal residents of Houston, Texas, at the time they filed their petition. They filed separate income tax returns for 1967 and joint income tax returns for 1968 and 1969 with the district director of internal revenue at Austin, Texas. The controversy here presented involves primarily the business activities of Maxine Mesinger, and she will be referred to as petitioner. Emil Mesinger, also a petitioner, will be referred to as Emil. For several years, including the ones here in controversy, petitioner has written a column entitled "Big City Beat" which has appeared 6 days each week in one of the major Houston newspapers. Prior to 1964, the column was published in the Houston Press, a Scripps-Howard newspaper; in that year, the Houston Press was acquired by the Houston Chronicle and it continued to publish the column. Described by petitioner as a "gossip column," it features the cafe society of Houston, including prominent visitors to the Houston area. The column frequently mentions hotels, apartment buildings, and clubs where social events occur *31 or socially prominent individuals visit or live. In 1963, petitioner and Emil decided to move to New York, where he had accepted a position and she expected to work for the Scripps-Howard newspapers. With these plans in mind, petitioner and Emil sold their home in Houston, and Emil moved to New York to begin his new job. However, family problems, particularly the illness and subsequent death of petitioner's mother, delayed petitioner's departure from Houston, and her New York job eventually failed to materialize. Misunderstandings also arose between petitioner and Emil, and they were divorced. She ultimately decided to stay in Houston and continue to write her column for the Houston Chronicle. In 1959, petitioner and Emil had become acquainted with John Mecom (hereinafter Mecom) and his wife, both of whom were socially prominent in Houston. The two families became close friends. They visited each other in their homes, took numerous trips and vacations together, and frequently spent weekends at Mecom's ranch. After petitioner and Emil were divorced, the Mecoms took an interest in the welfare of petitioners' son, Jay, then 12 years of age. Mecom provided Jay with a job during summer *32 vacations and helped interest him in raising and training horses. Mecom was later instrumental in effecting a reconciliation between petitioner and Emil, and they were remarried in 1967. Upon Emil's return to Houston, Mecom arranged for him to obtain a job with Stevens Interiors, a business in which Mecom owned an interest. Emil continued to work in this position during the years in controversy. Mecom had numerous business and financial interests in the Houston area, as well as in New York. He maintained offices in both cities. In 1966, he added the Houston Chronicle to his list of business ventures. In 1965, Warrior Constructors, Inc. (hereinafter Warrior), a corporation in which Mecom owned 50 percent of the stock, had completed the construction of Lamar Tower, a luxury highrise apartment in an expensive residential area in Houston called River Oaks. Warrior organized and owned all the stock of Lamar Tower Corporation, an organization which undertook the management of the apartment building. Lamar Tower was not a financial success. It was never fully occupied and was never operated at a profit. At least 25 percent of the apartments were always vacant. Eventually the mortgage *33 was foreclosed, and the building was taken over by the Government. For some time prior to late 1966, petitioner and her son Jay were living in a small one-bedroom efficiency apartment in the Shamrock Hilton Hotel. Her married daughter had left her husband and returned to live with petitioner. There were no nearby playgrounds or recreational facilities for a child of Jay's age. The expense of maintaining petitioner's household in the hotel and attempting to provide a wholesome environment for her son confronted her with serious problems. The Mecoms became aware of petitioner's financial and personal difficulties, and they suggested that she move into one of the vacant Lamar Tower apartments and occupy it rent-free. In late 1966, she did so. The arrangements for petitioner to live in the apartment were made between her and Mecom, who instructed the management of Lamar Tower not to charge her any rent. Although Mecom was not an officer of Warrior or Lamar Tower Corporation, his instructions were followed by the employees. The officers, managers, and employees of Lamar Tower Corporation and Warrior were not involved in making the arrangements with petitioner and were not told the circumstances *34 or reasons for furnishing her with the apartment. After Emil and petitioner were remarried in 1967, they were given a larger apartment, and they continued to live there through 1969. Lamar Tower's records showed petitioner as a tenant and set up a charge for the apartments at the customary rate. An entry was made to offset this charge, and Lamar Tower Corporation derived no tax savings or benefit by reason of the accounting treatment. Mecom was not aware of the accounting treatment given the apartments on the books and records of Lamar Tower Corporation. In addition to using the Lamar Tower apartments as the family residence, petitioner used them for business purposes in connection with the preparation of her column and in writing a book for publication. In the apartments, she had a business telephone, did much of her writing, kept notes and files, and conducted interviews and held conferences in connection with her work. In the larger apartment, a secretary used one of the bedrooms as an office. During the period in controversy, petitioner did not have an office at the Houston Chronicle. In 800 to 900 columns written by petitioner during 1967 through 1969, Lamar Tower was mentioned *35 113 times. However, International Club was mentioned 644 times, Warwick Hotel 637 times, Shamrock Hilton Hotel 434 times, the Cork Club 406 times, and the Tidelands Hotel Club 217 times. Respondent determined that petitioners are taxable on the fair rental value of the apartments furnished them in Lamar Tower. On this ground, their taxable income was increased by $4,800 per annum for the period in controversy. In his Answer to First Amended Petition, respondent alleged that the fair rental value of the apartment occupied by petitioners from August 1, 1967, to December 31, 1969, was $595 per month rather than $400 per month and, on this ground, claimed the additional deficiencies referred to above. OPINION Respondent's brief has narrowed the grounds on which he seeks to sustain the disputed deficiencies to the following: Lamar Tower Corporation, acting through its empowered agents, allowed Mr. and Mrs. Emil Mesinger to live in Lamar Tower, an asset of that corporation, rent free. This was done for two reasons: (1) It was anticipated that Mrs. Mesinger's presence would attract residents and (2) it was anticipated that Mrs. Mesinger would give Lamar Tower free publicity and promotion.
*36 Thus, respondent does not contend that the apartments constituted additional compensation to petitioner from the Houston Chronicle, which Mecom acquired in 1966. Nor does respondent contend that the apartment furnished after August 1, 1967, was part of the compensation for Emil's services to Stevens Interiors, a business controlled by Mecom. We, therefore, limit our consideration of the case to the grounds succinctly stated above. The issue so framed is purely factual, and the record as a whole shows that Lamar Tower Corporation did not furnish the apartments rent-free in anticipation that petitioner's presence would attract tenants or that she would give Lamar Tower publicity and promotion in her column. We think the only permissible conclusion is that the apartments were furnished to petitioner and her family as an act of generosity and friendship. . The testimony discloses a close family friendship between the Mecoms and petitioner and Emil spanning several years. The two families took trips together. They spent vacations together. They attended social functions together. The divorce of petitioner and Emil, though *37 followed by their subsequent remarriage, created serious family and financial problems, and the Mecoms were in a position to help solve those problems by allowing petitioner and her family to occupy rent-free an apartment which would otherwise have remained vacant. While petitioner frequently mentioned Lamar Tower in her column, the testimony is that she did not agree in advance to do so. An examination of the various columns mentioning Lamar Tower does not indicate that the publicity given the apartment building was business-motivated. Rather, the items mentioning Lamar Tower appear generally to be similar to those mentioning the Shamrock Hilton Hotel, the Warwick Club, and other similar facilities. Moreover, as noted in our Findings, several other clubs and hotels received far more publicity than Lamar Tower. We think such cases as , are clearly distinguishable on their facts. Having concluded that the use of the apartments was a gift to petitioners and that their value does not constitute taxable income by reason of section 102, we need not reach petitioners' alternative contention that a percentage of the fair rental value is *38 deductible as a business expense. And since no deficiency in tax is due from petitioners as a result of our conclusion, the additions to tax under section 6653(a) are not applicable. Decision will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩